**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DAVID CALLBECK, *on behalf of himself and as a representative of a class of participants and beneficiaries of the Wellington Retirement and Pension Plan*,<br><br>Plaintiff,<br><br>v.<br><br>WELLINGTON MANAGEMENT COMPANY LLP; WELLINGTON TRUST COMPANY, NA; RETIREMENT BENEFIT PLANS OVERSIGHT COMMITTEE, AND JOHN DOES 1–20,<br><br>Defendants. | Case No. 1:26-cv-14590 |

**CLASS ACTION COMPLAINT**

1. Plaintiff David Callbeck ("Plaintiff"), individually, on behalf of a class of similarly situated participants and beneficiaries of the Wellington Retirement and Pension Plan (the "Plan"), and on behalf of the Plan, brings this action against Wellington Management Company LLP ("WMC"), Wellington Trust Company, NA ("Wellington Trust"), the Retirement Benefit Plans Oversight Committee ("RBPOC"), and the presently unidentified members of RBPOC (collectively, "Defendants"), and alleges as follows:

2. Defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") by failing to prudently monitor the Plan's investment options and by continuing to retain investments after substantial and persistent underperformance called the prudence of their continued retention in the Plan into question.

Plaintiff brings this action to recover the resulting losses on behalf of the Plan under 29 U.S.C. §§ 1109 and 1132 and to obtain all other appropriate relief authorized by ERISA.

## PRELIMINARY STATEMENT

3. WMC is a sophisticated investment-management organization that provides investment-management and research services to institutional investors, including retirement plans. Evaluating investment strategies, performance, benchmarks, risk, and available alternatives lies at the heart of its business.

4. Yet the fiduciaries responsible for WMC's own retirement plan continued to retain several investment options (the "Challenged Investments")[1] in the Plan despite substantial and persistent underperformance against their benchmarks and comparable investment alternatives.

5. The Challenged Investments' significant underperformance would have been evident to a prudent fiduciary during the Class Period.[2] For instance, information available during the Class Period showed that the Challenged Investments had underperformed their respective benchmarks and the broader categories in which those investments were evaluated. In certain instances, independent institutional investment consultants and retirement-plan fiduciaries contemporaneously identified performance concerns involving the same investments or investment strategies and removed those investments from their respective plans.

6. The Challenged Investments also persistently underperformed readily available alternatives with materially similar investment objectives and characteristics. As alleged below,

[1] The "Challenged Investments" are (i) WTC Mid-Cap Opportunities Fund ("WTC Mid-Cap Opportunities"), (ii) WTC-CIF Research Equity Fund ("WTC Research Equity"), (iii) WTC-CIF Global Health Care Fund ("WTC Global Health Care"), and (iv) Vanguard U.S. Growth Fund ("Vanguard U.S. Growth").

[2] The "Class Period" means the period beginning six years before the filing of this Complaint through the date of judgment. Additional performance data, which was available to Defendants, is also presented for context.

that underperformance persisted across multiple evaluation periods and against multiple comparable alternatives.

7. Three of the underperforming Challenged Investments that Defendants elected to retain in the Plan are their own Wellington-affiliated products: WTC Mid-Cap Opportunities, WTC Research Equity, and WTC Global Health Care (collectively, the "Wellington Funds").

8. Wellington Trust is both a participating company and the Trustee of the Plan. The Plan offers participants Wellington Trust Company pooled funds ("WTC Pooled Funds"), and the Plan's audited financial statements state that WMC acts as investment adviser or sub-adviser for WTC Pooled Funds.

9. Investments in Defendants' proprietary funds constitute a substantial portion of the Plan's holdings. As of December 31, 2024, approximately $1.292 billion in Plan assets held in participant-directed accounts were invested in WTC Pooled Funds.

10. Among those holdings, approximately $118.98 million in Plan assets held in participant-directed accounts were invested in WTC Research Equity, $103.12 million in WTC Global Health Care, and $45.39 million in WTC Mid-Cap Opportunities at year-end 2024, approximately $267.5 million in the three challenged Wellington Funds alone.

11. The WTC Pooled Funds are collective investment trusts that are valued and traded daily. The Plan's audited financial statements state that assets invested in daily-priced WTC Pooled Funds generally may be withdrawn on one day's notice to the Trustee.

12. Despite the sustained underperformance and contemporaneous evidence alleged below, the fiduciaries responsible for monitoring and administering the Plan's investment options continued to retain the Challenged Investments in the Plan.

13. As a result of Defendants' violations of ERISA, the Plan suffered millions of dollars of losses.

14. To remedy Defendants' unlawful conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1331, because this action arises under ERISA.

16. Plaintiff brings this action pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to obtain relief on behalf of the Plan under ERISA § 409, 29 U.S.C. § 1109.

17. Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District and Defendants reside or may be found in this District.

18. Pursuant to ERISA § 502(h), 29 U.S.C. § 1132(h), Plaintiff will serve a copy of this Complaint upon the Secretary of Labor and the Secretary of the Treasury by certified mail.

## THE PARTIES

### PLAINTIFF

19. Plaintiff David Callbeck is a resident of Plymouth County, Massachusetts and a participant in the Wellington Retirement and Pension Plan within the meaning of 29 U.S.C. § 1002(7).

20. Plaintiff Callbeck worked for Wellington from approximately 2007 through 2020 and participated in the Plan. He continues to maintain retirement assets in the Plan.

21. During the Relevant Period, Plaintiff Callbeck's Plan account was invested in investment options selected and retained for inclusion in the Plan's investment menu, including Vanguard U.S. Growth.

22. Plaintiff Callbeck suffered financial injury to his individual Plan account as a result of the fiduciary breaches alleged herein and brings this action under ERISA § 502(a)(2) to obtain relief on behalf of the Plan.

## DEFENDANTS

23. Defendant Wellington Management Company LLP ("WMC") is a Delaware limited liability partnership headquartered in Boston, Massachusetts.

24. WMC is a participating employer in the Plan, which covers eligible partners and employees of Wellington Management Group LLP and its participating affiliates, including WMC and Wellington Trust.

25. According to the Plan's audited financial statements, WMC acts as investment adviser or sub-adviser for WTC Pooled Funds offered as investment options under the Plan. The financial statements characterize the Plan's investments in those funds as related-party and party-in-interest transactions.

26. Defendant Wellington Trust Company, NA ("Wellington Trust") is an affiliated Wellington company and a participating company in the Plan.

27. Wellington Trust is the Trustee of the Plan.

28. Wellington Trust also maintains WTC Pooled Funds offered through the Plan. The Plan's financial statements state that the net asset values of those pooled funds are determined each day the New York Stock Exchange is open and that admissions to and withdrawals from the funds are effected through Wellington Trust.

29. The Plan held approximately $1.292 billion in WTC Pooled Funds as of December 31, 2024.

30. The Plan's Schedule H to U.S. Department of Labor Form 5500 identifies the WTC Pooled Funds held by the Plan as party-in-interest investments.

31. Defendant RBPOC is the Plan Administrator. The Plan's audited financial statements expressly identify RBPOC in that capacity.

32. As Plan Administrator, RBPOC possessed discretionary authority and responsibility concerning administration of the Plan and therefore acted as a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) with respect to those functions. Upon information and belief, RBPOC also possessed discretionary authority and control over the selection, monitoring, and retention of the designated investment alternatives made available under the Plan.

33. Defendants John Does 1–20 are the presently unidentified persons who served as members of RBPOC during the Relevant Period.

## <u>ERISA FIDUCIARY DUTIES</u>

34. ERISA requires fiduciaries to discharge their duties with respect to a plan "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person acting in a like capacity and familiar with such matters would use. 29 U.S.C. § 1104(a)(1)(B).

35. The duty of prudence includes a continuing duty to monitor Plan investments and remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015).

36. Prudence is evaluated based on the circumstances prevailing when the fiduciary acted and the process used to evaluate the investment. In a participant-directed defined contribution plan, participants' ability to choose among investment options does not relieve the

responsible fiduciaries of their duty to prudently select and monitor the designated investment alternatives offered by the Plan. 29 C.F.R. § 2550.404c-1(d)(2)(iv).

37. Equity investments are commonly distinguished by characteristics including geographic exposure, market capitalization, and investment style. These characteristics are commonly used to evaluate whether investment funds pursue comparable strategies.

## DEFENDANTS' VIOLATIONS OF ERISA

### I. DEFENDANTS IMPRUDENTLY MANAGED THE PLAN'S INVESTMENT MENU.

#### A. The Wellington Retirement and Pension Plan.

38. The Wellington Retirement and Pension Plan is a single defined-contribution employee pension benefit plan governed by ERISA.

39. The Plan was originally effective October 30, 1979, and covers eligible partners and employees of Wellington Management Group LLP and participating affiliated companies, including WMC and Wellington Trust.

40. The RBPOC administers the Plan, Wellington Trust serves as Trustee, and Vanguard serves as recordkeeper and custodian.

41. Contributions are allocated to individual participant accounts. Participants then direct the investment of their accounts among investment options offered through the Plan. Those options include investments from Vanguard, State Street Global Advisors ("SSGA"), and WTC Pooled Funds.

42. Participants decide how to allocate their accounts among the investment options made available through the Plan. Participants do not select which investment options are included on the Plan's investment menu.

43. The Plan is substantial. As of December 31, 2024, it held approximately $3.160

billion in net assets available for benefits, compared with approximately $2.885 billion at year-end 2023.

44. At year-end 2024, approximately $2.091 billion in Plan assets was invested in collective investment trusts, including WTC Pooled Funds, SSGA funds, and the Vanguard Retirement Savings Trust. Approximately $1.061 billion was invested in mutual funds.

45. Wellington-affiliated funds represented an especially significant portion of the Plan. At year-end 2024, approximately $1.292 billion, more than forty percent of the Plan's invested assets, was held in WTC Pooled Funds.

46. The challenged Wellington Funds were among those investments. As of December 31, 2024, approximately $118.98 million in Plan assets were invested in WTC Research Equity, $103.12 million in WTC Global Health Care, and $45.39 million in WTC Mid-Cap Opportunities.

47. The Plan also held substantial assets in Vanguard investments. Among those investments, approximately $90.28 million was invested in Vanguard U.S. Growth at year-end 2024.

48. The challenged Wellington Funds also presented no general liquidity barrier preventing their removal. The Plan's financial statements state that WTC Pooled Funds are daily traded and assets invested in daily-priced WTC Pooled Funds generally may be withdrawn on one day's notice.

49. Such withdrawals are subject to Wellington Trust's reserved authority to require additional notice or delay particular withdrawals in specified circumstances.

50. The Plan's relationship with the Wellington Funds was also a related-party relationship. The audited financial statements disclose that WMC acts as investment adviser or sub-adviser for WTC Pooled Funds offered as investment options under the Plan and characterize

these investments as related-party and party-in-interest transactions.

### B. Defendants Populated the Plan With Wellington-Affiliated Investment Products.

51. Wellington-affiliated investment products accounted for a substantial portion of the Plan's investment menu and assets.

52. The challenged Wellington Funds were not merely products bearing the Wellington name. Wellington Trust is affiliated with WMC and offers collective investment trusts to qualified retirement plans. WMC expressly describes Wellington Trust's CITs as part of Wellington's defined-contribution product offerings.[3]

53. WMC's own Code of Ethics likewise refers to accounts maintained directly with Wellington Trust and other "Wellington Management Sponsored Products," while separately identifying accounts maintained in the Wellington Retirement and Pension Plan.[4]

54. The Plan's audited financial statements separately confirm the economic and corporate relationship. They state that WMC acts as investment adviser or sub-adviser for WTC Pooled Funds held by the Plan and characterize those investments as related-party and party-in-interest transactions.

**WTC MID-CAP OPPORTUNITIES**

55. During the Relevant Period, the Plan offered participants the WTC Mid-Cap Opportunities ("WTC Mid-Cap Opportunities"), an actively managed Wellington-affiliated domestic equity fund.

56. WTC Mid-Cap Opportunities is classified by Morningstar in the Mid-Cap Growth

[3] *See* WMC Defined Contribution Plans, https://www.wellington.com/en-us/institutional/capabilities/defined-contribution-plans.

[4] *See* WMC Code of Ethics, https://www.sec.gov/Archives/edgar/data/756913/000119312526156991/d224548dex99p8.htm.

category. WTC Mid-Cap Opportunities' stated objective is long-term total return in excess of the S&P MidCap 400 Index. It invests primarily in mid-capitalization companies within the combined market-capitalization ranges of the S&P MidCap 400 and Russell Midcap indexes.

57. WTC Mid-Cap Opportunities is almost entirely invested in equities. As of September 30, 2025, approximately 99% of its portfolio was invested in equities or equity-related holdings, it held 97 stocks, and only 0.9% of the portfolio consisted of short-term reserves.

58. WTC Mid-Cap Opportunities is benchmarked to the S&P MidCap 400 Index, has an annual expense ratio of 0.01%, and has an inception date of July 31, 2002. The Plan's 2025 Annual Participant Fee Disclosure reported WTC Mid-Cap Opportunities and its benchmark together.

59. Substantial Plan assets remained invested in WTC Mid-Cap Opportunities. As of December 31, 2024, the Plan held approximately $45.4 million in the Fund.

**a. WTC Mid-Cap Opportunities Persistently Underperformed Comparable Mid-Cap Growth Funds.**

60. During the Relevant Period, several large, established, actively managed Mid-Cap Growth funds were available as alternatives to WTC Mid-Cap Opportunities. These included: 1) Principal MidCap Fund R6 (PMAQX), 2) MFS Mid Cap Growth Fund R6 (OTCKX), 3) JPMorgan Mid Cap Growth Fund R6 (JMGMX), and 4) Federated Hermes MDT Mid Cap Growth Fund R6 (FGSKX).

61. Like WTC Mid-Cap Opportunities, each of these comparator funds is an actively managed domestic equity fund classified by Morningstar in the Mid-Cap Growth category. Each invests substantially all of its assets in equities and pursues capital appreciation through investments in mid-capitalization companies.

62. **Principal MidCap R6** is an actively managed Mid-Cap Growth fund. The fund

has approximately $22.9 billion in total net assets, a 0.57% expense ratio, and approximately 100.23% equity allocation.

63. **MFS Mid Cap Growth R6** is an actively managed Mid-Cap Growth fund. The fund has approximately $13.0 billion in total net assets, a 0.66% expense ratio, and approximately 98.78% equity allocation.

64. **JPMorgan Mid Cap Growth R6** is an actively managed Mid-Cap Growth fund. The fund has approximately $12.2 billion in total net assets, a 0.71% expense ratio, and approximately 99.10% equity allocation.

65. **Federated Hermes MDT Mid Cap Growth R6** is an actively managed Mid-Cap Growth fund. The fund has approximately $6.90 billion in total net assets, a 0.88% expense ratio, and approximately 98.63% equity allocation.

66. WTC Mid-Cap Opportunities and each of these comparator funds thus shared the same Morningstar Mid-Cap Growth classification, were actively managed, and invested almost entirely in equities.

| Fund | Morningstar Category | Total Net Assets | Expense Ratio | Equity Allocation | Management |
|---|---|---|---|---|---|
| WTC Mid-Cap Opportunities | Mid-Cap Growth | Unknown | 0.01% | 99.1% | Active |
| Principal MidCap R6 (PMAQX) | Mid-Cap Growth | $22.9B | 0.57% | 100.23%[5] | Active |
| MFS Mid Cap Growth R6 (OTCKX) | Mid-Cap Growth | $13.0B | 0.66% | 98.78% | Active |
| JPMorgan Mid Cap Growth R6 (JMGMX) | Mid-Cap Growth | $12.2B | 0.71% | 99.10% | Active |
| Federated Hermes MDT Mid Cap Growth R6 (FGSKX) | Mid-Cap Growth | $6.9B | 0.88% | 98.63% | Active |

[5] PMAQX holds negative short-term reserves of 0.23%.

67. WTC Mid-Cap Opportunities consistently underperformed each of these comparator funds over rolling three-year periods.[6]

| Three-Year Period Ending | WTC Mid-Cap Opportunities | Principal MidCap R6 | MFS Mid Cap Growth R6 | JPMorgan Mid Cap Growth R6 | Federated Hermes MDT Mid Cap Growth R6 |
|---|---|---|---|---|---|
| 2020 | 16.33% | 16.51% | 23.76% | 25.47% | 19.12% |
| 2021 | 23.02% | 28.54% | 28.84% | 32.13% | 28.91% |
| 2022 | 2.53% | 4.50% | 3.60% | 6.38% | 8.09% |
| 2023 | -1.02% | 6.69% | -0.18% | 0.00%[7] | 5.82% |
| 2024 | -2.11% | 5.17% | 0.00% | 1.06% | 8.77% |

68. Thus, during each rolling three-year period ending from 2020 through 2024, WTC Mid-Cap Opportunities underperformed each of the four comparator funds.

**b. WTC Mid-Cap Opportunities' Underperformance Was Evident Contemporaneously During the Relevant Period.**

69. WTC Mid-Cap Opportunities' underperformance was identified contemporaneously by institutional investors and investment consultants evaluating the strategy against broader universes of comparable mid-cap investments.

70. By 2022, the Employees Retirement System of Texas ("ERS") had placed its own Mid Cap Opportunities fund managed by a WMC affiliate ("ERS Wellington Fund") on a watch list because of performance concerns. The ERS Wellington Fund used the same or a substantially similar strategy as WTC Mid-Cap Opportunities, offered as part of the Plan. Materials presented

[6] Performance figures shown are the compounded annual growth rate, which is calculated using the following formula:

$$\text{CAGR} = \left(\frac{\text{Ending Value}}{\text{Beginning Value}}\right)^{\frac{1}{n}} - 1$$

[7] Returns with an absolute value below 0.01% are displayed as 0.00%.

to ERS identified poor relative performance over the one, three, and five-year periods and below-median peer results over each of those same periods.[8]

71. The performance concerns persisted into 2023. In April 2023, ERS reported that the ERS Wellington Fund remained on its watch list because of performance challenges. ERS's investment consultant monitored the investment using rolling performance relative to its broader peer universe, as well as benchmark performance, and subjected watch-listed investments to additional diligence.

72. By July 2023, ERS's review showed that ERS Wellington Fund had trailed its benchmark over the one-, three-, and five-year periods. Its five-year performance ranked in approximately the 90th percentile among its peers.

73. ERS's Product Review Committee thereafter recommended that the ERS Wellington Fund investment be removed from the Texa$aver investment lineup and that its assets be transferred to another mid-cap investment.

74. A separate institutional investor reached similar conclusions concerning another Mid Cap Opportunities fund managed by a WMC affiliate, which used the same or similar strategies as WTC Mid-Cap Opportunities. The Omaha Public Power District ("OPPD") placed its Mid Cap Opportunities investment managed by a WMC affiliate ("OPPD Wellington Fund") on formal watch in September 2023 after it failed OPPD's retention criteria.[9]

[8] *See* Employees Ret. Sys. of Tex., *Joint Meeting of the Board of Trustees and Investment Advisory Committee Minutes* 4–5 (Mar. 1, 2023) (explaining that investment funds were generally reviewed on a three-year basis and monitored on an ongoing basis; reporting rolling performance against peers; and identifying Wellington Mid-Cap Opportunities as being on ERS's watch list because of performance challenges and subject to additional diligence), https://agendasuite.org/iip/erstexas/file/getfile/3752.

[9] *See* Omaha Pub. Power Dist., *All Committees Meeting: Committee Meeting Package*, Retirement Plan—Appointment of Investment Manager (Mar. 18, 2025) (reporting that Wellington Mid Cap Opportunities was placed on watch in September 2023 for failing OPPD's retention criteria; that, as of September 30, 2024, Wellington continued to fail criteria requiring it to rank in the top 40% of Segal Marco Advisors'

75. OPPD's retention criteria evaluated the OPPD Wellington Fund against the entire universe of actively managed mid-cap equity portfolios tracked by Segal Marco Advisors, rather than against any of the four comparator funds identified above. To satisfy those criteria, the OPPD Wellington Fund was required both to rank within the top 40% of Segal Marco's actively managed mid-cap universe and to outperform the S&P MidCap 400 Index net of fees.

76. The OPPD Wellington Fund continued to fail those criteria. As of September 30, 2024, approximately one year after being placed on watch, the OPPD Wellington Fund still failed to satisfy the peer-universe and benchmark requirements.

77. OPPD then initiated a search for a new mid-cap investment to replace the OPPD Wellington Fund. After evaluating replacement candidates, its Trust Selection Committee recommended appointing another investment manager and replacing the OPPD Wellington Fund.

78. On March 18, 2025, the OPPD Board of Directors adopted Resolution No. 6692, which removed the OPPD Wellington Fund as OPPD's actively managed U.S. mid-cap equity investment. The board materials supporting the resolution recited that the OPPD Wellington Fund had been placed on watch in September 2023 for failure to meet OPPD's retention criteria, and that as of September 30, 2024, it still failed to rank in the top 40% of Segal Marco Advisors' universe of actively managed mid-cap equity portfolios or to exceed the S&P MidCap 400 Index net of fees.[10]

---

universe of actively managed mid-cap equity portfolios and to outperform the S&P MidCap 400 Index net of fees; and that the Trust Selection Committee, assisted by Segal Marco, thereafter initiated a search for a replacement mid-cap manager), https://oppd.com/media/320576/2025-3-mar-committee-meeting-package.pdf.

[10] *See* Omaha Pub. Power Dist. Bd. of Dirs., *Action Item, Retirement Plan—Appointment of Investment Manager*, and *Resolution No. 6692* (Mar. 18, 2025) (reciting that "Retirement Fund investment manager Wellington Mid Cap Opportunities has failed to meet the retention criteria established by the District's Trust Selection Committee"; that "[i]n September 2023, Retirement Fund investment manager, Wellington Mid Cap Opportunities (Wellington), was placed on 'watch' for failure to meet the Retirement Fund

79. The replacement extended across each of OPPD's retirement programs. Segal Marco Advisors identified Kayne Anderson Rudnick as "the replacement to Wellington Management Company to manage the actively managed U.S. Mid-Cap Equity allocation in the Retirement Plan, the 401(k) Plan and the 457 Plan," and advised the OPPD Board that, "[b]ased on the research process, Segal Marco Advisors supports the decision of the Trust Selection Committee in their recommendation to hire Kayne Anderson Rudnick Investment Management."[11]

80. Segal Marco Advisors reported again on Wellington's underperformance in its annual review with OPPD's board of directors, stating that "Wellington underperformed both its benchmark and peer group median in 2024."[12]

81. Meanwhile, the Plan continued to offer WTC Mid-Cap Opportunities. As of December 31, 2024, after ERS had recommended removing the ERS Wellington Fund, and after OPPD had placed the OPPD Wellington Fund on watch, approximately $45.4 million of Plan assets remained invested in WTC Mid-Cap Opportunities.

## WTC-CIF RESEARCH EQUITY

82. During the Relevant Period, the Plan offered participants the WTC-CIF Research Equity Fund ("WTC Research Equity"), a Wellington-affiliated domestic equity fund.

---

retention criteria"; and that "[a]s of September 30, 2024, Wellington failed to meet the retention criteria of ranking in the top 40% of Segal Marco Advisors universe of actively managed mid cap equity portfolios and exceeding the S&P Mid Cap 400 Index net of fees"), https://www.oppd.com/media/320588/2025-3-mar-resolution-6692-appointment-of-new-retirement-fund-investment-managers.pdf.

[11] *See* Letter from Jeffrey C. Boucek, Senior Vice President, Segal Marco Advisors, to Omaha Pub. Power Dist. Bd. of Dirs. 1, 3 (Mar. 4, 2025), *in* Omaha Pub. Power Dist. Bd. of Dirs., *Action Item, Retirement Plan—Appointment of Investment Manager* (Mar. 18, 2025), https://www.oppd.com/media/320588/2025-3-mar-resolution-6692-appointment-of-new-retirement-fund-investment-managers.pdf.

[12] *See* Segal Marco Advisors, *Omaha Public Power District Retirement Plan: 2024 Annual Performance Review* 8 (Apr. 15, 2025) (slide titled "Domestic Equity as of 12/31/24"), https://www.oppd.com/media/320642/2025-4-apr-retirement-plan-annual-report.pdf.

83. Research Equity is an actively managed U.S. equity investment. Its stated investment objective is to achieve long-term returns in excess of the S&P 500 Index. The Fund invests primarily in common stocks and other equity securities.

84. WTC Research Equity is benchmarked to the S&P 500 Total Return Index. As of September 30, 2025, the Fund had approximately $218 million in total net assets and an expense ratio of 0.02%. The Fund was established on July 31, 1990.

85. WTC Research Equity is almost entirely invested in equities. As of September 30, 2025, approximately 94.3% of its assets were invested in domestic stocks and another 5.3% in foreign stocks, with only 0.4% held in short-term reserves.

86. Substantial Plan assets remained invested in WTC Research Equity. As of December 31, 2024, the Plan held approximately $119.0 million in the Fund.

87. Beginning in 2021, WTC Research Equity underperformed its stated S&P 500 benchmark in four consecutive calendar years. The Fund returned 24.84% in 2021 compared with 28.71% for the S&P 500; negative 18.41% in 2022 compared with negative 18.11%; 26.18% in 2023 compared with 26.29%; and 22.23% in 2024 compared with 25.02%.

**a. WTC Research Equity Persistently Underperformed Comparable Large-Cap Funds**

88. During the Relevant Period, several large, established, actively managed large-cap equity funds were available as alternatives to WTC Research Equity. These included Fidelity Contrafund K (FCNKX), BNY Mellon Large Cap Securities Inc. (DREVX), Neuberger Berman Large Cap Growth Institutional (NGDLX), and Loomis Sayles Growth Y (LSGRX).

89. Each comparator is an actively managed domestic equity investment classified by Morningstar in the Large Growth category. Like WTC Research Equity, each comparator invests overwhelmingly in equities and pursues a large-cap U.S. equity strategy.

90. **Fidelity Contrafund K** is an actively managed Large Growth fund. Current comparative data identify approximately $172.7 billion in total net assets, a gross expense ratio of 0.67%, and approximately 89.5% of its portfolio classified as equity.

91. **BNY Mellon Large Cap Securities Inc.** is an actively managed Large Growth fund. Current comparative data identify approximately $2.5 billion in total net assets, a gross expense ratio of 0.69%, and approximately 99.7% of its portfolio classified as equity.

92. **Neuberger Berman Large Cap Growth Institutional** is an actively managed Large Growth fund. Current comparative data identify approximately $2.6 billion in total net assets, a gross expense ratio of 0.65%, and approximately 94.4% of its portfolio classified as equity.

93. **Loomis Sayles Growth Y** is an actively managed Large Growth fund. Current comparative data identify approximately $17.0 billion in total net assets, a gross expense ratio of 0.66%, and approximately 99.4% of its portfolio classified as equity.

94. WTC Research Equity and each comparator are actively managed large-cap domestic equity investments invested overwhelmingly in equities. The comparators are classified by Morningstar in the Large Growth category.

95. The relevant characteristics are summarized below:

| Fund | Morningstar Category | Total Net Assets | Expense Ratio | Equity Allocation | Management |
|---|---|---|---|---|---|
| WTC Research Equity | Large Growth | $218M | 0.02% | 99.6% | Active |
| Fidelity Contrafund K (FCNKX) | Large Growth | $172.7B | 0.67% | 89.51% | Active |
| BNY Mellon Large Cap Securities Inc. (DREVX) | Large Growth | $2.5B | 0.69% | 99.70% | Active |
| Neuberger Berman Large Cap Growth Institutional (NGDLX) | Large Growth | $2.6B | 0.65% | 94.37% | Active |
| Loomis Sayles Growth Y (LSGRX) | Large Growth | $17.0B | 0.66% | 99.39% | Active |

96. WTC Research Equity's rolling three-year performance materially lagged these alternatives over much of the Relevant Period. The annualized returns were:

| Three-Year Period Ending | WTC Research Equity | Fidelity Contrafund K | BNY Mellon Large Cap Securities | Neuberger Berman Large Cap Growth | Loomis Sayles Growth Y |
|---|---|---|---|---|---|
| 2019 | 15.27% | 19.04% | 14.67% | 16.95% | 19.44% |
| 2020 | 15.37% | 19.15% | 16.69% | 19.80% | 19.18% |
| 2021 | 26.71% | 29.04% | 26.97% | 33.10% | 27.23% |
| 2022 | 7.79% | 5.82% | 9.77% | 9.28% | 4.20% |
| 2023 | 8.72% | 7.59% | 11.05% | 9.66% | 9.14% |
| 2024 | 7.96% | 10.85% | 11.07% | 8.52% | 13.76% |

97. For the three-year period ending in 2024, Research Equity underperformed each of the four comparator funds. Research Equity returned 7.96% annually, compared with 10.85% for Fidelity, 11.07% for BNY Mellon, 8.52% for Neuberger Berman, and 13.76% for Loomis Sayles.

**b. WTC Research Equity's Underperformance Was Evident Contemporaneously During the Relevant Period.**

98. WTC Research Equity's performance was evaluated contemporaneously by Dahab Associates, Inc., an institutional investment consultant, on behalf of the Metropolitan District of Connecticut ("Metropolitan"). Dahab identified the investment as "Wellington Management

WTC[] Research Equity" and evaluated its performance against both the S&P 500 and Dahab's broader universe of Large Cap Core investment managers.[13]

99. By March 31, 2022, Dahab reported that the Fund ranked in the 56th percentile over the preceding year.[14] The Fund's 13.1% one-year return also trailed the S&P 500's 15.6% return.

100. By September 30, 2022, WTC Research Equity ranked in the 72nd percentile of Dahab's Large Cap Core universe over the preceding year and had lost 17.3%, compared with a 15.5% loss for the S&P 500.[15]

101. At year-end 2022, Dahab again reported substantial short-term relative weakness. WTC Research Equity had lost 18.4% during 2022 and ranked in the 71st percentile of the Large Cap Core universe for the year.

102. The underperformance continued into 2023. As of June 30, 2023, Dahab reported that WTC Research Equity ranked in the 80th percentile for the quarter, 57th percentile over the preceding year, and 58th percentile over three years.

---

[13] *See* Dahab Assocs., Inc., *Metro District CT – Wellington Management WTC-CIF Research Equity: Executive Summary* (Dec. 31, 2020) (reporting Research Equity's performance and percentile rankings within Dahab's Large Cap Core universe), in Metro. Dist. of Conn., *Pension & Post-Employment Benefits Investment Subcommittee Agenda* (Mar. 9, 2021), https://themdc.org/wp-content/uploads/2021/02/PPI-Investment-Subcommittee-Agenda-03.09.2021.pdf.

[14] Dahab's percentile rankings are ordered from highest to lowest performance. Accordingly, lower percentile rankings indicate stronger relative performance, while higher percentile rankings indicate weaker relative performance.

[15] *See* Dahab Assocs., Inc., *Metro District CT – Wellington Management WTC-CIF Research Equity: Total Return Comparisons* (Mar. 31, 2022) (reporting one-, three-, and five-year returns and rankings within the Large Cap Core universe), in Metro. Dist. of Conn., *Pension & Post-Employment Benefits Investment Subcommittee Agenda* (May 23, 2022), 05.23.2022-PPI-Investment-Agenda-w-Reports.pdf; *see also* Dahab Assocs., Inc., *Metro District CT – Wellington Management WTC-CIF Research Equity: Total Return Comparisons* (Sept. 30, 2022), in Metro. Dist. of Conn., *Pension & Post-Employment Benefits Investment Subcommittee Agenda* (Nov. 21, 2022).

103. At that point, WTC Research Equity also trailed the S&P 500 over every period reported by Dahab other than since-inception performance. For the year ended June 30, 2023, WTC Research Equity returned 17.3%, compared with 19.6% for the S&P 500. Over three years, it returned 13.5% annually compared with 14.6% for the S&P 500; over five years, 11.5% compared with 12.3%.[16]

104. Dahab's reporting did not remain academic. On May 19, 2023, Dahab presented its March 2023 performance review of Metropolitan's portfolio to the District's Personnel, Pension and Insurance Investment Subcommittee. The subcommittee recommended transferring the pension fund's large-cap equity investments—including funds invested in Wellington Management WTC Research Equity strategy—into a Fidelity S&P 500 Index Fund. The stated basis was performance: the "[t]otal performance … , net of management fees, have trailed the S&P 500 Index fund in all the below measured periods, except 1-year when it equaled the index," and the subcommittee recommended moving those assets to an index fund "for greater returns and lower costs."[17]

105. The Personnel, Pension and Insurance Committee adopted that recommendation on June 5, 2023. On motion made and duly seconded, the report was received and the resolution adopted "by unanimous vote of those present," resolving "[t]he pension fund's large cap investments in AQR Capital Management and Wellington be terminated and the money be transferred to Fidelity S&P500 Index Fund."[18]

---

[16] *See* Dahab Assocs., Inc., *Metro District CT – Wellington Management WTC-CIF Research Equity: Executive Summary* (June 30, 2023) (reporting Research Equity's quarterly, one-, three-, and five-year percentile rankings within the Large Cap Core universe and performance relative to the S&P 500), in Metro. Dist. of Conn., *Pension & Post-Employment Benefits Investment Subcommittee Agenda* (Aug. 22, 2023).

[17] *See* Metro. Dist. of Conn., *Personnel, Pension & Insurance Committee Agenda Materials* at 12–13 (July 26, 2023), https://themdc.org/wp-content/uploads/2023/07/PPI-Agenda-Materials-07.26.2023.pdf.

[18] *Id.* at 14.

106. The termination was carried out. Dahab's report on Metropolitan's pension plan as of December 31, 2023, presented to the Personnel, Pension and Insurance Committee on March 25, 2024, shows the plan's large-cap core allocation held entirely through the Fidelity 500 fund. Metropolitan's only remaining Wellington investment was a separate small cap mandate identified as Wellington SC, i.e., the Wellington Management WTC-CIF SC 2000 Fund.[19]

107. The results, decisions from other fiduciaries, and professional advice alleged above were available while Defendants continued to retain WTC Research Equity in the Plan. At year-end 2024, approximately $119 million of Plan assets remained invested in the Fund.

**WTC-CIF GLOBAL HEALTH CARE FUND**

108. During the Relevant Period, the Plan offered participants the WTC-CIF Global Health Care Fund ("WTC Global Health Care"), a Wellington-affiliated sector equity investment.

109. WTC Global Health Care seeks long-term total return through investment in the health-care sector. The Fund invests primarily in common stocks and depositary receipts of health-care and health-care-related companies worldwide, and at least 80% of its assets are invested in such securities.

110. Although WTC Global Health Care is not managed against a specific benchmark, its fact sheet identifies the MSCI World Health Care Index as a reference benchmark and the MSCI ACWI Health Care Index as its benchmark.

111. As of September 30, 2025, approximately 98.1% of the Fund's assets were invested in stocks and 100% of its sector allocation was health care.

---

[19] *See* Metro. Dist. of Conn., *Personnel, Pension & Insurance Committee Agenda Materials* at 17 (Mar. 25, 2024), https://themdc.org/wp-content/uploads/2024/03/PPI-Agenda-Materials-03.25.2024.pdf.

112. WTC Global Health Care had an expense ratio of 0.05%, total net assets of approximately $91 million, and an inception date of January 1, 1992.

113. The Plan maintained substantial participant assets in WTC Global Health Care. As of December 31, 2024, the Plan held approximately $103.12 million in the Fund.

**a. WTC Global Health Care Persistently Underperformed Comparable Health-Care Funds**

114. During the Relevant Period, several large and established actively managed health-care equity funds were available as alternatives to WTC Global Health Care. These included Fidelity Select Health Care (FSPHX), Janus Henderson Global Life Sciences I (JFNIX), T. Rowe Price Health Sciences (PRHSX), and BlackRock Health Sciences Opportunities Institutional (SHSSX).

115. Each comparator is an actively managed equity fund classified by Morningstar in the Health category and invests overwhelmingly in equities.

116. **Fidelity Select Health Care** is an actively managed Health fund with approximately $6.3 billion in total net assets, a 0.62% gross expense ratio, and a 97.52% equity allocation.

117. **Janus Henderson Global Life Sciences I** is an actively managed Health fund with approximately $5.8 billion in total net assets, a 0.78% gross expense ratio, and a 99.08% equity allocation.

118. **T. Rowe Price Health Sciences** is an actively managed Health fund with approximately $12.5 billion in total net assets, a 0.83% gross expense ratio, and a 91.71% equity allocation.

119. **<u>BlackRock Health Sciences Opportunities Institutional</u>** is an actively managed Health fund with approximately $6.4 billion in total net assets, a 0.84% gross expense ratio, and a 99.05% equity allocation.

120. WTC Global Health Care and each comparator are actively managed equity investments concentrated in the health-care sector and classified by Morningstar within the same Health category.

| Fund | Morningstar Category | Total Net Assets | Expense Ratio | Equity Allocation | Management |
|---|---|---|---|---|---|
| WTC Global Health Care | Health | $91M | 0.05% | 98.10% | Active |
| Fidelity Select Health Care (FSPHX) | Health | $6.3B | 0.62% | 97.52% | Active |
| Janus Henderson Global Life Sciences I (JFNIX) | Health | $5.8B | 0.78% | 99.08% | Active |
| T. Rowe Price Health Sciences (PRHSX) | Health | $12.5B | 0.83% | 91.71% | Active |
| BlackRock Health Sciences Opportunities Institutional (SHSSX) | Health | $6.4B | 0.84% | 99.05% | Active |

121. WTC Global Health Care's rolling three-year performance materially lagged these alternatives over the Relevant Period:

| Three-Year Period Ending | WTC Global Health Care | Fidelity Select Health Care | Janus Henderson Global Life Sciences I | T. Rowe Price Health Sciences | BlackRock Health Sciences Opportunities |
|---|---|---|---|---|---|
| 2018 | 3.15% | 5.97% | 3.96% | 5.11% | 8.48% |
| 2019 | 16.26% | 20.55% | 18.30% | 18.70% | 19.41% |
| 2020 | 17.44% | 20.68% | 19.24% | 19.36% | 17.68% |
| 2021 | 19.85% | 22.18% | 20.17% | 23.92% | 19.04% |
| 2022 | 5.86% | 6.55% | 9.32% | 8.98% | 8.18% |
| 2023 | 0.32% | 0.41% | 3.81% | 0.83% | 3.15% |
| 2024 | -1.37% | -1.61% | 2.75% | -2.68% | 0.65% |

**b. WTC Global Health Care's Underperformance Was Evident Contemporaneously During the Relevant Period.**

122. WTC publicly offered a separate investment vehicle during the Relevant Period under the name Wellington Global Health Care Equity Fund ("Wellington Health Care Equity Fund"). The fund pursued a global health-care equity strategy substantially similar to the strategy employed by the Plan's WTC Global Health Care Fund.[20]

123. The two investment vehicles were legally distinct. The Plan held a Wellington Trust collective investment fund established in 1992, while the publicly available Wellington Health Care Equity Fund was offered through Wellington Management Funds (Ireland) plc. The WTC Global Health Care portfolio itself is separately registered as an active Wellington Trust collective investment fund.

124. The investment strategies, however, substantially overlapped. The WTC Global Health Care Fund seeks long-term total return through investments in health-care companies

[20] *See* Vanguard, *WTC Global Health Care Fund Fact Sheet* 1 (Sept. 30, 2025); Wellington Mgmt., *Wellington Global Health Care Equity Fund Monthly Factsheet* 1 (Dec. 31, 2022), https://www.bblam.co.th/application/files/3216/7357/9878/Wellington_Global_Health_Care_Equity_Fund_12312022.pdf.

worldwide and uses the MSCI World Health Care Index as a reference benchmark. The publicly offered Wellington Health Care Equity Fund likewise sought long-term returns in excess of the MSCI World Health Care Index through investments in health-care companies worldwide.

125. The historical performance of the two vehicles also closely tracked one another. From 2015 through 2022, the annual returns of the WTC Global Health Care Fund and the publicly offered Wellington Health Care Equity Fund differed by only approximately 0.5 to 1.6 percentage points in each calendar year, while moving in the same direction each year.

126. By 2021, the performance of Wellington's health care strategy had materially declined. The WTC Global Health Care Fund returned only 3.67% in 2021, compared with 17.50% for its health-care benchmark. The separate Wellington Health Care Equity Fund experienced substantially similar performance, returning 2.5% in 2021 compared with 19.8% for the MSCI World Health Care Index.[21]

127. By year-end 2022, Wellington's own contemporaneous fact sheet reported that its Wellington Health Care Equity Fund had returned only 4.4% annually over the preceding three years, compared with 8.8% annually for the MSCI World Health Care Index.[22]

128. The Wellington Health Care Equity Fund's five-year annualized return at that time was 7.6%, compared with 10.2% for the MSCI World Health Care Index.

---

[21] *See* Vanguard, *WTC Global Health Care Fund Fact Sheet* 1 (Sept. 30, 2025) (reporting a 3.67% return for 2021 compared with 17.50% for the Fund's benchmark); Wellington Mgmt., *Wellington Global Health Care Equity Fund Monthly Factsheet* 1 (Dec. 31, 2022) (reporting a 2.5% return for 2021 compared with 19.8% for the MSCI World Health Care Index), Wellington_Global_Health_Care_Equity_Fund_12312022.pdf.

[22] *See* Wellington Mgmt., Wellington Global Health Care Equity Fund Monthly Factsheet 1 (Dec. 31, 2022) (reporting three-year annualized returns of 4.4% for the Fund and 8.8% for the MSCI World Health Care Index, and five-year annualized returns of 7.6% and 10.2%, respectively), Wellington_Global_Health_Care_Equity_Fund_12312022.pdf.

129. Wellington's subsequent reporting showed the shortfall widening rather than closing. Its factsheet dated December 31, 2023, reported a three-year annualized return of negative 1.2%, compared with 5.5% for the MSCI World Health Care Index, and a five-year annualized return of 9.4%, compared with 10.5% for the Index. The same factsheet reported calendar year returns of 2.5% against the Index's 19.8% in 2021, and negative 11.0% against the Index's negative 5.4% in 2022.[23]

130. The Plan's similar WTC Global Health Care Fund likewise continued to exhibit weak relative results. Its three-year annualized return for the period ending 2022 was 5.86%, below each of the four health-care comparators identified above.

131. Meanwhile, Defendants continued to retain the WTC Global Health Care Fund in the Plan, and approximately $103.1 million in Plan assets remained invested in the Fund at year-end 2024.

**VANGUARD U.S. GROWTH FUND**

132. During the Relevant Period, the Plan offered participants the Vanguard U.S. Growth Fund ("Vanguard U.S. Growth"), an actively managed domestic equity fund.

133. Vanguard U.S. Growth seeks long-term capital appreciation by investing primarily in large-capitalization U.S. companies considered to have above-average earnings-growth potential. The Fund uses multiple investment advisers and is benchmarked to the Russell 1000 Growth Index.

---

[23] *See* Wellington Mgmt., *Wellington Global Health Care Equity Fund Monthly Factsheet* 1 (Dec. 31, 2023) (USD S Accumulating Unhedged share class, ISIN IE00B0590K11; reporting three-year annualized returns of −1.2% for the Fund and 5.5% for the MSCI World Health Care Index, five-year annualized returns of 9.4% and 10.5%, and calendar year returns of 2.5% versus 19.8% in 2021, −11.0% versus −5.4% in 2022, and 5.8% versus 3.8% in 2023), https://www.bpi.com.ph/content/dam/bpi-wealth/target-fund-fact-sheets/2024/BPI%20Global%20Health%20Care%20Feeder%20Fund%20Target%20Fund%20Fact%20Sheet.pdf.

134. Morningstar classifies Vanguard U.S. Growth in the Large Growth category. The Fund has approximately $43.3 billion in total net assets, an expense ratio of 0.25%, and approximately 98.77% of its assets invested in equities.

135. Vanguard U.S. Growth experienced substantial performance deterioration beginning in 2021. After returning 58.74% in 2020, the Fund returned only 12.45% in 2021, compared with 27.60% for the Russell 1000 Growth Index. In 2022, the Fund lost 39.58%, compared with a 29.14% loss for the Index.

**a. Vanguard U.S. Growth Underperformed Comparable Large-Growth Funds.**

136. During the Relevant Period, several large and established actively managed Large Growth funds were available as alternatives to Vanguard U.S. Growth. These included American Century Growth R6 (AGRDX), William Blair Large Cap Growth I (LCGFX), Empower Large Cap Growth Institutional (MXGSX), and JPMorgan Large Cap Growth R6 (JLGMX).

137. Each comparator, like Vanguard U.S. Growth, is an actively managed fund classified by Morningstar in the Large Growth category. Each comparator also uses the Russell 1000 Growth Index as its benchmark and invests approximately 98% or more of its portfolio in equities.

138. **American Century Growth R6** is an actively managed Large Growth fund with approximately $14.9 billion in total net assets, a 0.48% expense ratio, and approximately 99.68% of its portfolio invested in equities.

139. **William Blair Large Cap Growth I** is an actively managed Large Growth fund with approximately $1.8 billion in total net assets, a 0.75% expense ratio, and approximately 99.30% of its portfolio invested in equities.

140. **Empower Large Cap Growth Institutional** is an actively managed Large Growth

fund with approximately $2.3 billion in total net assets, a 0.61% expense ratio, and substantially all of its portfolio invested in equities.

141. **JPMorgan Large Cap Growth R6** is an actively managed Large Growth fund with approximately $111.9 billion in total net assets, a 0.50% expense ratio, and approximately 98.96% of its portfolio invested in equities.

142. Vanguard U.S. Growth and each of the comparator funds are therefore actively managed Large Growth equity investments benchmarked to the same Russell 1000 Growth Index and invested overwhelmingly in equities.

| Fund | Morningstar Category | Total Net Assets | Gross Expense Ratio | Equity Allocation | Management |
|---|---|---|---|---|---|
| Vanguard U.S. Growth Fund Admiral Shares (VWUAX) | Large Growth | $43.3B | 0.25% | 98.77% | Active |
| American Century Growth R6 (AGRDX) | Large Growth | $14.9B | 0.48% | 99.68% | Active |
| William Blair Large Cap Growth I (LCGFX) | Large Growth | $1.8B | 0.75% | 99.30% | Active |
| Empower Large Cap Growth Institutional (MXGSX) | Large Growth | $2.3B | 0.61% | 100.00% | Active |
| JPMorgan Large Cap Growth R6 (JLGMX) | Large Growth | $111.9B | 0.50% | 98.96% | Active |

143. Vanguard U.S. Growth's rolling-three-year performance materially lagged these alternatives over much of the Relevant Period:

| Three-Year Period Ending | Vanguard U.S. Growth | American Century Growth R6 | William Blair Large Cap Growth I | Empower Large Cap Growth Institutional | JPMorgan Large Cap Growth R6 |
|---|---|---|---|---|---|
| 2017 | 12.31% | 12.72% | 12.91% | 12.34% | 13.64% |
| 2018 | 9.54% | 10.43% | 12.19% | 9.90% | 10.99% |
| 2019 | 20.89% | 20.54% | 23.49% | 21.45% | 24.71% |
| 2020 | 28.64% | 22.09% | 25.13% | 24.90% | 29.92% |
| 2021 | 33.45% | 33.11% | 33.72% | 33.02% | 37.33% |
| 2022 | 2.45% | 6.09% | 5.80% | 9.86% | 11.59% |
| 2023 | -0.52% | 8.16% | 6.80% | 7.77% | 6.23% |
| 2024 | 4.94% | 7.81% | 6.16% | 9.15% | 10.63% |

144. Vanguard U.S. Growth again underperformed each of the four comparator funds during the three-year period ending in 2024. The Fund returned 4.94% annually, compared with 7.81% for American Century, 6.16% for William Blair, 9.15% for Empower, and 10.63% for JPMorgan.

**b. Vanguard U.S. Growth's Underperformance Was Evident Contemporaneously During the Relevant Period.**

145. Vanguard U.S. Growth's relative underperformance was evident contemporaneously across the broader Large Growth category. In 2021, Vanguard U.S. Growth returned approximately 12.5%, while the average Large Growth fund returned approximately 20.4%. In 2022, the Fund lost approximately 39.6%, while the Large Growth category declined approximately 32.1%. The Fund therefore underperformed its broader category by approximately 7.9 percentage points in 2021 and 7.5 percentage points in 2022.[24]

[24] *See* AAII, Vanguard US Growth Admiral (VWUAX) (reporting annual Fund returns and Large Growth category averages, including 12.5% versus 20.4% in 2021 and −39.6% versus −32.1% in 2022), https://www.aaii.com/fund/ticker/VWUAX.

146. Vanguard U.S. Growth's 2022 performance was also substantially worse than its stated benchmark. The Fund lost 39.58%, compared with a loss of 29.14% for the Russell 1000 Growth Index, following a 2021 return of only 12.45% compared with 27.60% for the Index.

147. Vanguard U.S. Growth's underperformance relative to its peers has continued throughout the Class Period. Indeed, when compared to all other funds within the Large Growth category, during the past 1-year, 3-year, 5-year, and 10-year periods, the Vanguard U.S. Growth fund has ranked in the lowest or second lowest performance quartile of its peer universe of large-cap growth funds.[25]

148. Vanguard U.S. Growth's performance and management changes were also being publicly identified at the time. In its 2022 review of widely held 401(k) funds, Kiplinger reported that Vanguard U.S. Growth had lost approximately 27.8% during the preceding year, stated that the Fund had recently "faltered," and identified repeated changes among the Fund's investment managers as a concern in assessing its long-term merits.[26]

149. Vanguard U.S. Growth's underperformance also prompted contemporaneous action by the fiduciaries of other retirement plans. Advised by independent institutional investment consultants, those fiduciaries placed the Fund on formal watch during the Relevant Period, and

[25] *Vanguard U.S. Growth Fund Admiral Shares*, Morningstar (Oct. 5, 2026), https://www.morningstar.com/funds/xnas/vwuax/performance (reporting the following trailing returns for the Vanguard U.S. Growth fund: YTD: lowest quartile (83rd percentile); 1-Year: lowest quartile (83rd percentile); 3-Year: second lowest quartile (60th percentile); 5-Year: lowest quartile (83rd percentile); 10-Year: second lowest quartile (53rd percentile)). As of October 5, 2026, Morningstar reports that there are 918 funds in the Large Growth category.

[26] *See* Nellie S. Huang, *2022's Best Mutual Funds in 401(k) Retirement Plans*, Kiplinger (2022) (reporting Vanguard U.S. Growth's −27.8% one-year return, describing the Fund as having recently "faltered," and discussing repeated changes among its investment managers), 2022's Best Mutual Funds in 401(k) Retirement Plans | Kiplinger.

one ultimately removed it, on the basis of performance information equally available to Defendants.[27]

a. On August 4, 2022, the Butte County, California 457 Deferred Compensation Committee reviewed the second-quarter 2022 performance report prepared by its investment consultant, the Hyas Group. Under the heading "On-Watch Funds," the Butte Committee was advised that "[t]he Vanguard US Growth Adm Fund is underperforming" and that "this fund be placed on watch." The Butte Committee so moved, and the motion passed unanimously.[28] Butte removed the investment option entirely in February 2026, with the committee noting the fund was on the watch list continuously "since the second quarter of 2022 for quantitative factors" and was "trailing the Benchmark and Peer Group for both the three-year and five-year periods."[29]

b. On April 20, 2023, the Columbus Consolidated Government 457 Deferred Compensation Plan Board reviewed its first-quarter 2023 investment option performance with its consultant, AndCo. The Board was advised that, on the summary tracking matrix of watch-listed investments, "Vanguard US Growth

[27] The plans described below identified the investment as the "Vanguard US Growth Adm" or "Vanguard U.S. Growth Admiral" fund, *i.e.*, the Admiral Shares class of the Vanguard U.S. Growth Fund. *See* Vanguard, *Vanguard U.S. Growth Fund Admiral Shares (VWUAX)*, https://investor.vanguard.com/investment-products/mutual-funds/profile/vwuax.

[28] *See* Butte Cnty., Cal., 457 Deferred Comp. Comm., *Meeting Minutes* at 3 (Aug. 4, 2022) (under "On-Watch Funds" within the Hyas Group second-quarter 2022 performance report, the recommendation to place the Vanguard US Growth Adm Fund on watch and the unanimous vote to do so), https://www.buttecounty.net/AgendaCenter/ViewFile/Minutes/_08042022-32.

[29] *See* Butte Cnty., Cal., 457 Deferred Comp. Comm., *Meeting Minutes* 3 (Feb. 5, 2026) (reporting the Fund's continuous watch status since the second quarter of 2022 and recording the motion to remove the Vanguard US Growth Adm Fund and replace it with Fidelity Blue Chip Growth K), https://www.buttecounty.net/AgendaCenter/ViewFile/Agenda/_02052026-302.

was the one that stood out the most," and the consultant "recommended keeping it on watch."[30]

c. On June 21, 2023, the Retirement Policy Committee of the South Carolina Public Employee Benefit Authority received its consultant CapTrust's first-quarter 2023 performance report for the State Optional Retirement Program. CapTrust "recommends keeping the Vanguard U.S. Growth Admiral fund in the Corebridge lineup on the watch list for further review."[31]

d. On September 27, 2023, the Trust Committee of the City of Seattle Voluntary Deferred Compensation Plan—a plan that had ended the preceding quarter "at approximately $1.65 billion"—received the Hyas Group's second-quarter 2023 performance report. The Committee was advised that the "investment line-up performed well in the second quarter of 2023 and only the Vanguard US Growth was in violation of the performance criteria in the Investment Policy." The Fund remained on watch.[32]

[30] *See* Columbus Consol. Gov't, 457 Deferred Comp. Plan Bd., *Meeting Minutes* (Apr. 20, 2023) (recording AndCo's review of the Investment Option Performance Review and its recommendation to keep Vanguard US Growth on watch), https://boule-us-production.s3.amazonaws.com/uploads/production/board_answer/attachment/260690/457_Deferred_Compensation_Plan_Bd._04-20-23.pdf?X-Amz-Expires=60&X-Amz-Date=20260910T181821Z&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Credential=AKIATHOFOHMMBRNFRBE2/20260910/us-east-1/s3/aws4_request&X-Amz-SignedHeaders=host&X-Amz-Signature=d88dc2526acc530f6c5c28960f2e890cebea4c5d362c1f39dd0a60a638f6e677.

[31] *See* S.C. Pub. Emp. Benefit Auth., Ret. Policy Comm., *Meeting Minutes* 2 (June 21, 2023), https://www.peba.sc.gov/sites/default/files/rpc_minutes_june_21_2023.pdf.

[32] *See* City of Seattle Voluntary Deferred Comp. Plan, *Regular Trust Committee Meeting Minutes* 2 (Sept. 27, 2023) (reporting that only Vanguard US Growth was in violation of the Investment Policy performance criteria, and that "[t]he American Funds EuroPacific Growth Fund, Vanguard US Growth Fund and the PIMCO Total Return Fund remain on watch"), https://www.seattle.gov/documents/departments/humanresources/deferred%20compensation/2023_0927_dcplanregularmeetingminutes.pdf.

150. By the three-year period ending in 2022, the Fund's deteriorating annual performance had translated into sustained underperformance against each of the four Large Growth comparators identified above. That underperformance persisted through the three-year periods ending in both 2023 and 2024.

151. Meanwhile, Defendants continued to retain Vanguard U.S. Growth in the Plan, and approximately $90.3 million in Plan assets remained invested in the Fund at year-end 2024.

### C. Defendants' Failure to Remove the Challenged Investments Caused Losses to the Plan.

152. Defendants' continued retention of the Challenged Investments caused losses to the Plan because participant assets remained invested in funds that materially underperformed prudent alternative investments during the periods alleged above.

153. Those losses are measured by comparing the returns actually earned on participant assets invested in the Challenged Investments with the returns those assets would have earned had Defendants timely removed the Challenged Investments from the Plan's investment menu and replaced them with prudent alternatives.

154. The Plan held substantial assets in each Challenged Investment during the periods in which their performance had materially worsened. As of year-end 2024, the Plan held approximately $45.4 million in WTC Mid-Cap Opportunities, $103.1 million in WTC-CIF Global Health Care, $119 million in WTC-CIF Research Equity, and $90.3 million in Vanguard U.S. Growth.

155. Plaintiff's current analysis estimates that the losses attributable to the Challenged Investments are in the tens of millions of dollars.

156. Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary who breaches duties imposed by ERISA is personally liable to make good to the Plan any losses resulting from the breach.

## II. Plaintiff Lacked Knowledge of Defendants' Conduct and Prudent Alternatives.

157. Plaintiff and other Plan participants did not have knowledge of all material facts necessary to understand that Defendants had breached their fiduciary duties in selecting, monitoring, and retaining the Challenged Investments.

158. Plan participants were not responsible for selecting or monitoring the Plan's investment menu and did not have access to the information available to Defendants concerning the performance and continued suitability of the Plan's investment options. Among other things, participants did not have access to RBPOC's investment reviews, meeting minutes, reports concerning the Challenged Investments, communications with investment managers or consultants, or other materials reflecting Defendants' evaluation of whether the Challenged Investments should remain in the Plan.

159. Nor did Plaintiff and other Plan participants possess Defendants' knowledge and expertise concerning the universe of alternative investments available to a retirement plan of the Plan's size. Participants were provided an investment menu selected by Defendants and could choose among the options Defendants made available, but they were not responsible for determining whether other investments should have been offered in place of the Challenged Investments.

160. The information made available to participants concerning the Challenged Investments did not disclose the process by which Defendants selected and monitored those investments, the criteria Defendants used to determine whether an investment should be removed,

the alternatives Defendants considered, or the reasons Defendants continued to retain the Challenged Investments despite the performance deficiencies alleged herein.

161. Plaintiff therefore did not have actual knowledge of Defendants' breaches of fiduciary duty more than three years before the filing of this action.

## CLASS ACTION ALLEGATIONS

162. Plaintiff brings this action individually and as a class action on behalf of the Plan pursuant to Federal Rule of Civil Procedure 23(a) and (b)(1), or alternatively, Rule 23(b)(3).

163. Plaintiff seeks to represent the following Class:

> All participants and beneficiaries of the Wellington Retirement and Pension Plan who invested in any of the Challenged Investment options during the six years preceding the filing of this action through the date of judgment.

164. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable. The Plan has thousands of participants and beneficiaries. The identities of Class members are ascertainable from records maintained by Defendants and the Plan.

165. Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff is a Plan participant whose account was invested in a Challenged Investment option and whose claims arise from the same alleged failures to prudently select, monitor, and retain Plan investments that give rise to the claims of other Class members. Plaintiff and the Class seek relief on behalf of the Plan for losses resulting from that conduct.

166. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with those of the Class. Plaintiff has retained counsel experienced in complex class action and ERISA litigation. Plaintiff has no conflicts of interest with Class members that would impair his ability to represent the Class.

167. Commonality: Common questions of law and fact exist as to Plaintiff and the Class, including but not limited to:

a. Which Defendants acted as fiduciaries with respect to the selection, monitoring, and retention of the Challenged Investments;

b. Whether Defendants breached their fiduciary duties in selecting, monitoring, and retaining the Challenged Investments;

c. Whether any Defendant is liable as a co-fiduciary under 29 U.S.C. § 1105;

d. Whether the fiduciaries responsible for appointing and monitoring other Plan fiduciaries breached their duty to monitor;

e. The amount of losses resulting to the Plan from the alleged breaches; and

f. The appropriate equitable and remedial relief.

168. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

169. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect those interests. Plaintiff seeks relief on behalf of the Plan under ERISA §§ 409 and 502(a)(2), including restoration to the Plan of losses resulting from the alleged fiduciary breaches. Adjudication of those claims would therefore affect the interests of other Plan participants and beneficiaries.

170. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over questions affecting only individual Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The claims arise from Defendants' common fiduciary conduct with respect to the Plan's investment menu, and the principal questions concerning fiduciary status, breach, causation, Plan losses, and appropriate relief can be resolved on a class-wide basis.

## COUNT I
**Breach of Fiduciary Duty of Prudence**
**29 U.S.C. § 1104(a)(1)(B)**

171. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs above as if set forth fully herein.

172. Defendants were fiduciaries of the Plan to the extent they exercised discretionary authority or control over the management of the Plan or its assets or had discretionary authority or responsibility in the administration of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

173. ERISA requires fiduciaries responsible for selecting and monitoring Plan investments to discharge those duties with the care, skill, prudence, and diligence required by 29 U.S.C. § 1104(a)(1)(B).

174. The fiduciaries responsible for the Plan's investment menu had a continuing duty to monitor the Plan's investments and remove imprudent ones. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 575 U.S. at 530.

175. As detailed above, Defendants responsible for the Plan's investment menu failed to prudently monitor and remove the Challenged Investments as their persistent underperformance and other warning signs became evident. The Challenged Investments materially underperformed

comparable alternatives over the periods alleged above, yet Defendants continued to retain them as investment options under the Plan while substantial Plan assets remained invested in them.

176. Each of the above actions and omissions described in this Complaint further demonstrates that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

177. The foregoing fiduciary breaches caused losses to the Plan that Plaintiff's preliminary analysis estimates exceed $50 million.

178. Each Defendant found to have breached its fiduciary duties is liable under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), to restore to the Plan the losses resulting from that breach and for such other relief as ERISA permits.

**COUNT II**
**Failure to Monitor Fiduciaries**

179. Plaintiff incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

180. Defendants who exercised discretionary authority to appoint fiduciaries responsible for selecting and monitoring the Plan's investments had a fiduciary duty to prudently monitor the performance of those appointees.[33]

[33] The precise allocation of authority to appoint and monitor the Plan's investment fiduciaries is not disclosed in publicly available Plan materials and is within Defendants' knowledge and control. Plaintiff will amend these allegations as appropriate upon discovery of that information.

181. This duty required the appointing fiduciaries to monitor their appointees at reasonable intervals and in such a manner as reasonably to ensure that the appointed fiduciaries' performance complied with the terms of the Plan and ERISA.

182. Defendants breached their duty to monitor by failing to adequately monitor the fiduciaries responsible for the Plan's investment menu and their process for evaluating and retaining the Challenged Investments.

183. A prudent monitoring process would have revealed the persistent underperformance and other warning signs alleged above and whether Defendants were prudently investigating and responding to those conditions.

184. To the extent Defendants failed to prudently monitor and remove the Challenged Investments, Defendants failed to take appropriate action to remedy those breaches, including by ensuring that the Challenged Investments were adequately investigated and, when appropriate, removed from the Plan.

185. As a direct and proximate result of these breaches, the Plan suffered losses because Defendants failed to ensure the timely removal of the Challenged Investments from the Plan's investment menu, and participant assets remained invested in those funds after they should have been removed.

186. Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Plaintiff seeks restoration to the Plan of the losses resulting from these breaches and all other appropriate equitable or remedial relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and as the representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows.

A. A determination that this action may proceed as a class action under Rule 23(b)(1) or, in the alternative, Rule 23(b)(3), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A declaration that Defendants breached their fiduciary duty of prudence under ERISA;

D. A declaration that Defendants breached their fiduciary duty to monitor appointed fiduciaries;

E. An order requiring each Defendant found liable for a fiduciary breach to make good to the Plan the losses resulting from that breach and to restore the Plan to the position it would have occupied absent the breach;

F. Such other equitable or remedial relief as the Court deems appropriate under ERISA;

G. An award of pre-judgment interest;

H. An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1); and

I. An award of such other and further relief as the Court deems equitable and just.

Dated: October 9, 2026

*<u>/s/ Christopher M. Nienhaus</u>*
Christopher M. Nienhaus
Matthew J. Langley (*pro hac vice* forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, IL 60614
Tel: (773) 554-9354
matt@almeidalawgroup.com
chris@almeidalawgroup.com

*Counsel for Plaintiff & the Proposed Class*